**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

Warren W. Hughes,

              Debtor

Chapter 13
Case No. 22-10078

### <u>AMENDED MEMORANDUM OF DECISION</u>

When, as here, the chapter 13 trustee opposes confirmation under 11 U.S.C. § 1325(b), the plan cannot be confirmed unless the debtor devotes his "projected disposable income" to payment of unsecured creditors over the "applicable commitment period." A debtor's projected disposable income and his applicable commitment period are based, in part, on his "current monthly income." That term is at the center of the dispute in this case.

Warren Hughes, the debtor, is a physical therapist operating a business as a sole proprietor. At the outset of his case, the debtor completed Official Form 122C-1, entitled Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period. On the form, he reported that there were four persons in his household and that his average monthly income was roughly $4,000 (calculated as gross business receipts of $12,200 minus operating expenses of $8,200). Based on these figures, the debtor reported that his annualized current monthly income was about $48,000. At the time, the median income for a family of four in Maine was approximately $97,000. As a result, Form 122C-1 showed that the debtor was a below-median-income debtor with a 36-month commitment period. The debtor did not complete Official Form 122C-2, which employs a means test to compute the disposable income of an above-median-income debtor.

The trustee opposes confirmation for one reason: he believes that the debtor should not be permitted to deduct his business expenses when calculating current monthly income ("CMI"). For the most part, the trustee's belief is rooted in 11 U.S.C. § 1325(b)(2)(B), which provides for business expenses to be deducted *from* CMI in the calculation of disposable income. Because business expenses are deducted from CMI, says the trustee, they cannot also be deducted when calculating CMI in the first place. In the trustee's estimation, Mr. Hughes is above median income, his commitment period is 60 months, and he is subject to a means test when computing disposable income. There is ample authority supporting the trustee's position.

Although the dispute here is framed with relative ease, resolving the dispute is more challenging. Neither the debtor nor the trustee offers an interpretation of the pertinent statutes that is entirely satisfactory. Although both interpretations appear to collide, to some extent, with traditional precepts for construing statutes, the debtor has the better view. Although that view renders section 1325(b)(2)(B) surplusage, it results in a more coherent statutory scheme and better comports with stated policy goals. For this reason, the debtor may deduct his ordinary and necessary business expenses from gross business receipts when calculating CMI. The trustee's objection will be overruled.

## I.      THE BASIC STATUTORY SCHEME

The term "currently monthly income" is defined by 11 U.S.C. § 101(10A). Discourse about the meaning of a statutorily defined term ordinarily begins with the definition provided by the statute. In this instance, however, a more panoramic perspective is essential. As noted, the trustee's objection arises under section 1325(b), so the orientation logically begins there.

Section 1325(b) has four paragraphs which together outline the disposable income test in a chapter 13 case. The first paragraph is the operative one, and it creates a bar to confirmation

2

when either the trustee or the holder of an unsecured claim objects. 11 U.S.C. § 1325(b)(1).

When the trustee is the objector, paragraph one blocks confirmation unless the plan provides for

the debtor to use his "projected disposable income to be received in the applicable commitment

period" to make payments to unsecured creditors.  Id.  Paragraph two defines disposable income,

paragraph three supplies a rule for determining certain components of disposable income, and

paragraph four provides a rule for identifying the applicable commitment period.  Id. §

1325(b)(2)-(4).

In general, the applicable commitment period is either 36 months or 60 months.  Id. §

1325(b)(4).  Whether the commitment period is 36 or 60 months depends on a comparison of the

debtor's CMI and the "median family income" for the debtor's home state and household size.

See id.  A debtor whose CMI is below median income can propose a plan that lasts only 36

months, but a debtor who is at or above median income must propose a plan with a term of 60

months.  Id.

A debtor's relationship to median income also has implications for determining the

debtor's disposable income.  In general, disposable income consists of the debtor's CMI "less

amounts reasonably necessary to be expended" for specified purposes, including basic living

expenses.  See id. § 1325(b)(2).  A below-median-income debtor can reduce CMI by any

amounts that are reasonably necessary for these purposes.  The same is not true for an above-

median-income debtor; for him, a means test standardizes certain expenses that qualify as

reasonably necessary.  See id. § 1325(b)(3) (incorporating standards imposed by 11 U.S.C. §

707(b)(2)(A)).  In other words, the above-median-income debtor is subject to prescribed

limitations on amounts that may be shielded from creditors through payments for necessities.

The means test presents a fair amount of complexity.  At this juncture, suffice it to say that although section 1325(b)(2)(B) indicates that business expenses may be deducted from CMI in the calculation of disposable income, section 1325(b)(3) reverses course by imposing a means test that simply does not permit any such deductions.  For the above-median-income debtor engaged in business, the statute appears to give with one hand, but take with the other.

At a high level, "Chapter 13 borrows the means test from Chapter 7, where it is used as a screening mechanism" to determine whether the filing is abusive.  <u>Ransom v. FIA Card Servs., N.A.</u>, 562 U.S. 61, 65 n.1 (2011).  This screening tool is formulaic: if the debtor's CMI reduced by (a) specified monthly expenses and (b) secured and priority debt payments exceeds a set threshold, then the chapter 7 filing is presumptively abusive.  11 U.S.C. § 707(b)(2)(A).  A debtor's CMI must be calculated in a chapter 7 case to complete the means test, and CMI must likewise be calculated in a chapter 13 case to determine the applicable commitment period and disposable income.  As a result, any construction of CMI must make sense in both chapter 7 and chapter 13.

## II.    THE DISPUTE

In this case, there are two competing interpretations of CMI.  The approach preferred by the trustee treats gross business receipts as "income" for purposes of 11 U.S.C. § 101(10A).  According to the trustee, a debtor engaged in business may not deduct business expenses from gross business receipts in calculating CMI.  This belief reflects the understanding that, per section 1325(b)(2)(B), business expenses can and must be deducted only at the point where disposable income is calculated.  This "gross business receipts" approach, or something like it, has been adopted by most of the courts that have grappled with the meaning of CMI in this context.  *See, e.g.,* <u>Drummond v. Wiegand (In re Wiegand)</u>, 386 B.R. 238 (B.A.P. 9th Cir. 2008);

4

*see also* <u>In re Hall</u>, No. 22-40967, 2023 WL 2746104, at *4 n.6 (Bankr. W.D. Wash. Mar. 31,

2023) (collecting decisions); <u>In re Harkins</u>, 491 B.R. 518, 539 (Bankr. S.D. Ohio 2013)

(concluding that section 1325(b)(2) "plainly demonstrates that self-employed debtors must

include their gross business receipts in the calculation of their current monthly income").

 The debtor views the statute differently.  He advocates a "net income" approach to CMI

which would allow him to deduct ordinary and necessary business expenses from gross business

receipts when calculating CMI.  A handful of reported decisions follow the net income approach,

notwithstanding section 1325(b)(2)(B).  *See, e.g.,* <u>In re Romero</u>, No. 12-20793-BKC-AJC, 2013

WL 241742 (Bankr. S.D. Fla. Jan. 22, 2013); <u>In re Roman</u>, No. 11-01415 BKT, 2011 WL

5593143 (Bankr. D.P.R. Nov. 16, 2011).

 Despite their differences, the parties agree that the debtor's business expenses must be

deducted somewhere in the analysis.  Before diving more deeply into that analysis, several

caveats are warranted.  First, the Court is asked to decide the meaning of CMI for a chapter 13

debtor engaged in business as a sole proprietor.  This case does not involve a business operated

by a corporation, limited liability company, or other entity owned by a chapter 13 debtor.

Second, this case does not involve a debtor who earns income as an employee.  Third, the parties

have not asked the Court to decide whether any particular expense is a business expense or a

personal expense.

### III. THE MEANING OF "CURRENT MONTHLY INCOME"

 In this case, CMI is best understood to consist of the debtor's gross business receipts

minus ordinary and necessary business expenses.  The net income approach to CMI is consistent

with the text of section 101(10A) and makes better sense than the alternative in light of other

parts of the statutory scheme layered onto the disposable income test by the Bankruptcy Abuse

5

Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Specifically, the net income approach to CMI harmonizes with the benchmark against which CMI is measured under section 1325(b)(3) and (4). The net income approach also coheres with the IRS guidelines utilized by the means test. Beyond that, the net income approach better serves BAPCPA's overriding purpose of ensuring that debtors repay their creditors as much as they can reasonably afford. *See* Ransom, 562 U.S. at 64 (describing the purpose of BAPCPA's reforms). The net income approach also happens to be reflected on the Official Forms approved by the United States Supreme Court and the Judicial Conference of the United States. Together, these considerations outweigh the interpretive arguments advanced by the trustee.

## A. The Interpretive Approach: Plain Language and Beyond

The Bankruptcy Code defines CMI as "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during [a specified] 6-month period[.]" 11 U.S.C. § 101(10A)(A). From there, the statute goes on to provide that CMI "includes any amount paid by any entity other than the debtor . . . on a regular basis for the household expenses of the debtor or the debtor's dependents[.]" Id. § 101(10A)(B)(i). Finally, the statute specifies that Social Security benefits and certain other payments are excluded from CMI. Id. § 101(10A)(B)(ii).

The terms "average" and "monthly" provide little, if any, interpretative challenge. As some courts have recognized, however, assigning meaning to the term "income" is trickier. *See, e.g.*, In re Harkins, 491 B.R. at 525-30. The Code does not supply a definition for this basic term, and dictionary definitions are far from conclusive. *See, e.g., Income,* BALLENTINE'S LAW DICTIONARY (3d ed. 1969) (defining income as "[a] word having different meanings, depending upon the connection in which it is used and the result intended to be accomplished"); *see also*

WEBSTER'S NEW WORLD COLLEGE DICTIONARY 683 (Victoria Neufeldt & David B. Guralnik eds., 3d ed. 1997) (defining income as "the money or other gain received . . . by an individual, corporation, etc. for labor or services or from property, investments, operations, etc."). The meaning of the term necessarily turns on context.

In section 101(10A), the word "income" appears in close proximity to the word "receives." Income is something "that the debtor receives[.]" 11 U.S.C. § 101(10A). When the debtor is a sole proprietor operating a business, the question is whether section 101(10A) income comprises all business receipts, or instead consists of the net amount left for the debtor's personal use after payment of business expenditures. Some courts posit that CMI must consist of the gross income generated by a sole proprietor because the proprietor "receives" that gross income. *See, e.g.,* In re Hall, 2023 WL 2746104, at *7 (noting that in a "disregarded single-member LLC," the "member is treated as a sole proprietor and 'receives' the gross income of the LLC"). While this may be true, it is not determinative: the sole proprietor receives both the gross income and the net income. The term "receives" does not illuminate what qualifies as income for purposes of section 101(10A).

In the thick of section 101(10A), the phrase "without regard to whether such income is taxable income" also stands out. Some courts and commentators read this phrase to mean that CMI necessarily includes all receipts generated by a business, regardless of whether some of those receipts are offset by expenses that are deductible for tax purposes. *See* In re Gonzalez, 597 B.R. 133, 138 (Bankr. D. Colo. 2018) (citing Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY § 379.1, ¶ 21 (4th ed. 2007)). This Court is not persuaded. The statutory language should be given its natural import, namely that certain types of income are swept into CMI even though those types of income are not subject to taxation. It takes little

effort to identify forms of income that are immune from federal income taxation—gifts and inheritances, payments on account of a life insurance policy, and certain military benefits, to name only a few. *See* 26 U.S.C. §§ 101, 102, 134. These forms of income may be exempt from taxation, but nevertheless considered when evaluating a debtor's ability to repay creditors in bankruptcy. The "without regard" clause in section 101(10A) illuminates only what is included in CMI. That clause does not identify what is excluded from CMI: it does not resolve whether the "income" that should be added and averaged is net of business expenses.

Congress employed the term "gross income" in other parts of the Code. *See, e.g.,* 11 U.S.C. §§ 101(18)(A), 1114(m), 1325(b)(2)(A)(ii). The term "net income" also appears in several places. *See* id. §§ 521(a)(1)(B)(v), 1205(b)(3). Because section 101(10A) is bereft of either qualifier, gross or net, CMI could be interpreted either way and so the interpretive work must advance beyond the text of the statute. Two guideposts inform the next stage of the mission: first, inferences derived from statutory context and second, congressional purpose underlying BAPCPA. *See* Smith v. Me. Bureau of Revenue Servs. (In re Smith), 910 F.3d 576, 578 (1st Cir. 2018) (charting a similar interpretive course when construing 11 U.S.C. § 362(c)(3)(A)).

### B.  Statutory Inferences: Contextual Clues

When it added the concept of CMI to the disposable income test, Congress also layered on the concept of median family income, a term defined by 11 U.S.C. § 101(39A), and made the means test applicable to certain debtors. As explained below, both of these contemporaneous additions give rise to the inference that CMI, for a debtor engaged in business, consists of the net income derived from self-employment. This inference is particularly strong because median family income serves as the yardstick against which CMI is measured and, when that

measurement shows that a debtor is above median, the debtor is subject to the means test.  These concepts work together and must therefore hang together in a sensible fashion.

Under section 101(39A), median family income means "the median family income both calculated and reported by the Bureau of the Census in the then most recent year[.]"  11 U.S.C. § 101(39A)(A).  The Census Bureau accumulates the data used to calculate median family income through multiple surveys.[1]  For the purposes of these surveys, the Census Bureau defines "self-employment income" as net income from self-employment (i.e., gross receipts minus operating expenses).[2]

Because section 101(39A) uses this Census Bureau definition, median family income includes the net income of self-employed individuals.  If CMI is understood to mean net income in a case involving a debtor engaged in business, then section 1325(b)(3) and (4) entail a sensible apples-to-apples comparison of two amounts, both of which are net of business expenses.  If CMI is instead viewed as gross business receipts, then the disposable income test involves a less sensible comparison.[3]  When section 101(10A) is interpreted in tandem with section 101(39A), as it should be, the net income approach to CMI is more compelling than the alternative.

---

[1]  *See* Jessica Semega & Melissa Kollar, Income in the United States: 2021, U.S. CENSUS BUREAU (Sept. 13, 2022) https://www.census.gov/library/publications/2022/demo/p60-276.html [https://perma.cc/CBC6-3N4N] (reporting median household income based on information collected in the Current Population Survey ("CPS")); U.S. CENSUS BUREAU, 2021 American Community Survey: 1-Year Estimates https://data.census.gov/table?q=DP03 (last visited Aug. 2, 2023, 12:05 P.M.) (reporting median household income based on information collected in the American Community Survey ("ACS")).

[2]  These definitions can be found at census.gov by navigating to the "Surveys and Programs" dropdown menu, selecting the ACS or CPS, and looking for the "Technical Documentation" page.  From there, the "Subject Definitions" can be located with relative ease.

[3]  The apples-to-apples comparison only goes so far: CMI and median family income are not synonymous.  They are different concepts created for different purposes.  But still, the close working relationship between them in this context is undeniable.

A similar inference arises upon a close examination of the chapter 7 means test, which limits the deductions that an above-median-income debtor can take from CMI in calculating disposable income. *See* 11 U.S.C. § 1325(b)(3) (incorporating provisions of 11 U.S.C. § 707(b)(2)(A)). Because a debtor's CMI relative to median income may subject that debtor to the rigors of the means test, the concept of CMI should harmonize with that test. The gross business receipts approach to CMI clashes with the structure of the IRS guidelines that the means test incorporates. By contrast, the net income approach to CMI conforms with those IRS guidelines. This conformity supports an inference that CMI is best understood to mean the net income derived through the operation of a business.

In general, the expense allowances provided by the means test consist of standardized amounts and categories used by the Internal Revenue Service "to help calculate taxpayers' ability to pay overdue taxes." Ransom, 562 U.S. at 66. When making this assessment, the IRS first determines a taxpayer's income and then deducts standardized "allowable expenses." *See* IRS, INTERNAL REVENUE MANUAL § 5.15.1.3(1) (Aug. 29, 2018) (requiring analysis of "income and expenses to determine the amount of disposable income . . . available to apply to the tax liability"); id. § 5.15.1.12 (Aug. 29, 2018) ("Determining Individual Income"); id. § 5.15.1.8 (July 24, 2019) ("Allowable Expense Overview"). The expense allowances provided by the means test do not apply to business expenses. Id. § 5.15.1.8(2). That the IRS did not attempt to standardize business expenses makes good sense. The IRS may be able to standardize a taxpayer's personal expenses, but business expenses are far less susceptible to that type of effort.

The IRS manual reflects the understanding that the income of a taxpayer engaged in business consists of net income: ordinary and necessary business expenses are deducted from gross receipts at the first stage of the calculus in determining the taxpayer's income. Id. §

5.15.1.12(2)(c). The allowable expenses deducted at the second step of the analysis, in assessing

disposable income available to pay tax debts, do not include business expenses. *See* id. §

5.15.1.8(2). Allowable expenses fall into three categories: (1) living expenses "based on

National and Local Standards"; (2) "Other Necessary Expenses . . . that meet the necessary

expense test"; and (3) "Other Conditional Expenses" that may be allowed based on the

circumstances. Id. § 5.15.1.8(1). The manual lists 16 subcategories of "Other Expenses," which

may be allowed if they meet the "necessary expense test." Id. § 5.15.1.11 (Nov. 22, 2021).

Expenses meet the necessary expense test if they are "necessary to provide for a taxpayer's and

his or her family's health and welfare and/or *production of income*." Id. § 5.15.1.8(1) (emphasis

added).

Some of the decisions cited by the trustee seize upon the "production of income"

language embedded in the necessary expense test and conclude that business expenses may

qualify as Other Necessary Expenses. *See, e.g.,* In re Arnold, 376 B.R. 652, 655 (Bankr. M.D.

Tenn. 2007); *see also* In re Harkins, 491 B.R. at 532-35. These decisions are not persuasive on

this score. A better read of the IRS manual yields the takeaway that the production of income

language is intended to capture expenses incurred by wage earners incident to their employment.

Beyond that, the chapter 7 means tests only permits deduction of "the debtor's actual monthly

expenses for *the categories specified* as Other Necessary Expenses" in the IRS manual. 11

U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis added). Most business expenses do not fit comfortably in

the sixteen specified subcategories, and for good reason. The categories are designed to cover

certain types of essential personal expenses, while business expenses are accounted for in the

calculation of the income of a taxpayer who happens to be engaged in business. *See* IRS,

INTERNAL REVENUE MANUAL § 5.15.1.11 (noting that fees "related to business operations . . .

should not be claimed as personal expenses" under the "Other Expense" category for accounting

and legal fees). In short, business expenses cannot be deducted under the means test, even

though some language in the IRS manual might, in isolation, suggest otherwise.

Under the gross business receipts approach, the debtor is not permitted to deduct business

expenses in the calculation of CMI, and must instead take them, if at all, in the calculation of

disposable income. But section 1325(b)(3) kicks the above-median-income debtor to the means

test for business expense deductions, where none can be found. Because of the way that the IRS

manual works, an above-median-income debtor engaged in business and confined to that manual

is not able to take *any* business expense deductions in the calculation of disposable income. The

gross business receipts approach thus fails to provide as much meaning to section 1325(b)(2)(B)

as proponents of that approach (including the trustee) would suggest.

The net income approach to CMI complements the details of the means test and the

concept of median family income, resulting in a disposable income test that functions in a

coherent fashion for both above- and below-median-income debtors. In addition, the net income

approach does a better job than the alternative furthering the congressional purpose behind the

legislation that overhauled the disposable income test.

### C.  The Purpose of BAPCPA: Discerning a Debtor's Ability to Pay

BAPCPA "was enacted in response to an upward trend in consumer bankruptcy filings

and concerns that bankruptcy relief was 'too readily available' and 'sometimes used as a first

resort, rather than a last resort.'"  Morse v. Rudler (In re Rudler), 576 F.3d 37, 40 (1st Cir. 2009)

(quoting H.R. Rep. No. 109-31(l), at 4 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 90).  At the

time, Congress was concerned that consumer debtors with the ability to repay their creditors

were opting for liquidation cases rather than reorganization cases.  Id.  To remedy this perceived

abuse, Congress adopted the means test in chapter 7 cases and incorporated it into certain chapter 13 cases. Ransom, 562 U.S. at 64-65. The means test was adopted to "ensure that debtors repay creditors the maximum they can afford." H.R. Rep. No. 109-31(l), at 2, *reprinted in* 2005 U.S.C.C.A.N. at 89. This purpose is best achieved by an interpretation of CMI that is meaningfully connected to a debtor's ability to make payments to creditors. *See* Ransom, 562 U.S. at 71 (interpreting the means test in light of BAPCPA's purpose).

Despite the trustee's suggestion, if an above-median-income debtor engaged in business is confined to the IRS standards in calculating deductible expenses, that debtor will not be able to deduct any business expenses in the disposable income calculus. And the disposable income figure for that debtor will be based on gross business receipts, a portion of which are not available to make payments to creditors because they are needed for ordinary and necessary business expenses. For the above-median-income debtor, the gross business receipts approach sets a minimum dividend that is not meaningfully connected to that debtor's ability to pay. That result cannot be what Congress intended when it overhauled the disposable income test.

The gross business receipts approach, as envisioned by the trustee, also leads to different results for two chapter 13 debtors in identical economic circumstances, solely because one is engaged in business and the other is not. Take the example of Bill and Tom. Bill is a salaried debtor who earns $50,000 per year (before any payroll deductions). Tom is a sole proprietor with annual gross receipts of $200,000 and business expenses of $150,000, leaving net income of $50,000. The applicable median family income for both is $75,000. They are financially identical in all other pertinent respects: they have the same personal expenses and neither of them contributes to charity or expects any change in their income or expenses. Under the gross business receipts approach, Bill could propose a three-year plan, but Tom could not. During his

five-year plan, Tom would end up paying his unsecured creditors substantially more than Bill,

even though the two are in identical circumstances in terms of the amount each has available to

pay creditors.

Although some of the cases cited by the trustee suggest that Congress may have intended

to treat debtors engaged in business differently than wage earners, none of those decisions offer a

cogent reason that might have animated that thinking.  For example, at least one court has

suggested that Congress may have intended to force more debtors into five-year plans, opining

that result "certainly fits with the overall goal of making debtors repay the maximum they can

afford."  In re Gonzalez, 597 B.R. at 142.  Another court has suggested, without elaboration, that

perhaps "Congress simply did not want those persons generating significant revenues through a

business to have access to three-year chapter 13 plans."  In re Wiegand, 386 B.R. at 243.

Wiegand's supposition about congressional intent holds little, if any, water.  True, Congress

could have decided to push debtors with significant business revenues into five-year chapter 13

plans.  That is a rational line that could have been drawn.  But the line that was, in fact, drawn

centers on median family income.  Currently, no state has median family income for a family of

four in excess of $165,000.[4]  For example, the median family income for a family of four in New

York is about $126,000.  Under the Wiegand reasoning, a chapter 13 debtor engaged in business

in New York, with a family of four and gross business receipts of $130,000, has "significant

revenues" and should be excluded from a three-year plan.  Using median *family* income as a

gauge of whether *business* revenues are "significant" is nonsensical.  And, perhaps more to the

point, five-year plans do not by themselves advance the maximum-payment goal of BAPCPA.  If

---

[4]  The Court previously issued a memorandum of decision that referenced the median family income
data applicable to a case filed between April 1, 2022, and May 14, 2022, the timeframe within which the
debtor filed his chapter 13 case.  This amended memorandum of decision refers to the median family
income data that would apply to a case commenced today.

14

a debtor engaged in business is deemed above median because he cannot deduct business expenses in the calculation of CMI and is then denied a business expense deduction under the IRS guidelines, he will be stuck in a five-year plan and almost certainly unable to afford the minimum dividend the test suggests he should be able to afford.

The perplexities of the gross business receipts approach are not confined to chapter 13 cases: the approach also leads to incongruous outcomes in chapter 7 cases. Specifically, if CMI were interpreted to mean gross business receipts, a chapter 7 debtor with primarily consumer debts who is generating significant receipts would have to rebut a presumption of abuse to avoid dismissal or conversion of the case. The presumption would arise regardless of whether those receipts were only enabled by significant operating expenses. In this way, the gross business receipts approach in chapter 7 would result in a presumption that is not well-tethered to the debtor's ability to pay creditors.

To unpack this, recall that the presumption of abuse arises if the debtor's CMI reduced by (a) specified monthly expenses and (b) secured and priority debt payments exceeds a set threshold. 11 U.S.C. § 707(b)(2)(A). Business expenses are not included among the monthly expenses that may be deducted under this formula; they are not covered by the IRS standards that the means test incorporates. So, if business expenses are not deductible in the calculation of CMI before the means test is applied, then they are not deductible for purposes of the means test at all. And if business expenses are not accounted for, the difference between CMI and the specified expenses will often exceed the threshold set forth in the statute, making debtors engaged in business more likely to encounter a presumption of abuse based on an assumption that the difference is available to pay creditors. That assumption does not hold water where the difference includes funds that are used to pay business expenses because any funds so expended

are not, in fact, available to pay creditors.  And it strains credulity to suggest that such funds should, as a policy matter, be made available to creditors.

The means test was designed to weed out of the liquidation chapter debtors who can afford to make payments on their debts.  For debtors engaged in business, a means test formula beginning with gross business receipts would more often force conversion or dismissal based on the faulty assumption that the debtor has the ability to pay a dividend to unsecured creditors. This outcome cannot be reconciled with the intent animating the means test.

In more ways than one, the gross business receipts approach leads to results at odds with the purpose of BAPCPA.  That approach treats more debtors as above median income, giving rise to a presumption of abuse in chapter 7 and spitting out a disposable income figure in chapter 13 neither of which are reflective of the debtor's ability to make payments to creditors.  By contrast, construing CMI to mean net income for sole proprietors yields a more accurate measure of ability to pay and consequently better serves the purpose of BAPCPA.

### D.  The Legislative History.

The evolution of the disposable income test, alongside a sliver of legislative history, suggests that Congress may not have appreciated the issue raised in this case.  When Congress enacted BAPCPA, it was apparently focused on limiting the personal expenses that high-earning chapter 13 debtors could take in the calculation of disposable income.  This fixation may have resulted in a failure to consider the consequences of the legislation for debtors looking to deduct business expenses.

Before BAPCPA, "disposable income" was defined as "income which is received by the debtor and which is not reasonably necessary to be expended"--

(A) for the maintenance or support of the debtor . . . including charitable contributions . . . in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2) (1998). With the passage of BAPCPA, the starting point in the calculus changed. Instead of beginning with "income . . . received by the debtor," the formula began with the newly added concept of CMI. *See* 11 U.S.C. § 1325(b)(2) (2005). From CMI, the same three categories of deductions were taken for reasonably necessary expenditures, but the categories were renumbered as (A)(i) maintenance or support of the debtor; (A)(ii) charitable contributions; and (B) for a debtor engaged in business, expenses necessary for the continuation of the business. Id.

BAPCPA also made the means test applicable to above-median-income debtors in calculating expenses deductible from CMI. Specifically, section 1325(b)(3) provided that, for an above-median-income debtor, the means test would determine "[a]mounts reasonably necessary to be expended under paragraph (2)[.]" Id. § 1325(b)(3). Paragraph three thus kicked above-median-income debtors to the means test for *all* expense deductions – personal, charitable, and business. However, as explained above, the means test incorporates IRS guidelines that standardize only personal expenses. For this reason, BAPCPA failed to provide workable deductions for business expenses or charitable contributions in any case involving an above-median-income debtor.

It did not take long for Congress to detect a problem. In 2006, Congress amended the statute to carve charitable contributions out of the means test. *See* 11 U.S.C. § 1325(b)(3) (2006); *see also* 152 Cong. Rec. H8812-01 (daily ed. Dec. 6, 2006) (statement of Sen. John Conyers) (observing that BAPCPA had restricted above-median-income debtors to the "rigid

IRS-based means tests" which did not include expense deductions for tithing or other charitable

donations).  A similar fix has not been forthcoming for business expenses even though the means

test similarly does not include deductions for them, and even though there is some congressional

awareness that incorporation of the IRS guidelines may have resulted in other unintended

complications.  *See* 152 Cong. Rec. H8812-01 (statement of Sen. Conyers).  The absence of a

legislative fix could mean any number of things, but the Court's task is to interpret the words that

were used in the statutes enacted.  Here, that task is informed to some extent by the legislative

history.  If that history revealed that Congress had actively considered how the IRS guidelines

would apply to a debtor engaged in business, the Court would be less inclined to adopt the net

income approach to CMI and thereby render section 1325(b)(2)(B) surplusage.

### E.      The Net Income Approach Also Happens to be Consistent with the Forms

As noted, the trustee leans heavily on section 1325(b)(2)(B).  He contends that

interpreting CMI to mean business receipts less business expenses would lead to the absurd

result of permitting business expenses to be deducted twice – first at the CMI stage, and then

again at the disposable income stage.  The trustee is right; this would be absurd.  The absurdity

can be avoided by using the Official Forms.

Congress has specifically authorized the Supreme Court to prescribe, by general rules,

forms for use in cases under Title 11.  28 U.S.C. § 2075.  When Congress passed BAPCPA, this

authorization was supplemented with the directive that the rules were to prescribe a form for the

statement of CMI "and may [also] provide general rules on the content of such statement."  Pub.

L. No. 109-8, § 1232, 119 Stat. 23 (codified at 28 U.S.C. § 2075).  In general, debtors are

required to use the Official Forms prescribed by the Judicial Conference of the United States

"without alteration," Fed. R. Bankr. P. 9009(a), and the forms are supposed to be consistent with

the Code, Fed. R. Bankr. P. 9009(c). The Supreme Court and the Judicial Conference have

approved a form that chapter 13 debtors must use when filing the required statement of CMI:

Official Form 122C-1. *See* Fed. R. Bankr. P. 1007(b)(6). This decision interprets the Code and

does so in a manner that happens to be consistent with that form.

Official Form 122C-1 adopts the net income approach to CMI for a debtor engaged in

business, requiring him to (1) subtract ordinary and necessary operating expenses from gross

receipts, (2) report net monthly income from business operations, and (3) carry that figure down

in the calculation of CMI. Official Form 122C-2, which above-median-income debtors must use

to calculate disposable income, ports that net income figure over and subtracts from it all

deductions provided by the form. Those deductions do not include business expenses. So, the

above-median-income debtor who uses the Official Forms only deducts business expenses once,

in the calculation of CMI. In describing the calculation of CMI, the Committee Notes to Official

Form 122 observe that the form defines business income as gross receipts minus operating

expenses "consistent with usage in the Internal Revenue Manual and the American Community

Survey of the Census Bureau [.]" Official Form 122, Committee Note 2005-2008. This

observation shows that the committee tasked with adopting the form strove to capture CMI in a

manner that would jibe with both the IRS standards incorporated into the means test and the

Census Bureau standards that give meaning to the related concept of median family income. In

reaching this decision, the Court endeavors to do the same.

## IV.    THE TRUSTEE'S APPEAL TO THE CANONS OF CONSTRUCTION

In his bid for adoption of the gross income approach, the trustee relies on certain canons

of construction. He contends that the explicit deduction of business expenses in section

1325(b)(2)(B) shows that Congress did not intend to net out business expenses in the calculation

of CMI. This perspective is rooted in several maxims of statutory interpretation, including the plain meaning rule and the canon against surplusage. Like all canons, however, these two are not absolute rules, but rather indications of statutory meaning that can be overcome by indications that point the other way. *See* Marx v. Gen. Revenue Corp., 568 U.S. 371, 385 (2013) (discussing limits of the preference against surplusage); *see also* Lockhart v. United States, 577 U.S. 347, 352 (2016) (observing that none of the canons of statutory interpretation are absolute).

The plain meaning rule only goes so far, and not far enough to sustain the trustee's argument. Under that rule, a statute is enforced as written if "the statutory language is unambiguous and the statutory scheme is coherent and consistent." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (quotation marks omitted). Here, the meaning of CMI – when examined in specific context – is not plain. *See* id. at 341 ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *see also* In re Harkins, 491 B.R. at 530 (concluding that the specific context of section 101(10A) does not clarify the meaning of CMI). And even if section 1325(b)(2)(B) illuminated the meaning of CMI as the trustee contends, the interpretation that he advocates would "produce a result demonstrably at odds with the intention of its drafters." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989) (quotation marks omitted). In such an instance "the intention of the drafters, rather than the strict language, controls." Id. Here, the purpose of BAPCPA and the inferences drawn from other parts of the Code enacted by BAPCPA drive the interpretation of CMI, despite the contrary (but weaker) inference that could be derived from section 1325(b)(2)(B).

The trustee also invokes the canon against surplusage, arguing that if business expenses are to be deducted in the calculation of CMI, then section 1325(b)(2)(B) is deprived of meaning.

This canon holds that "if possible, effect shall be given to every clause and part of a statute." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) (quotation marks omitted).   But this canon is not immutable, and its persuasive force is diminished by the futility of any attempt to give meaning to section 1325(b)(2)(B) for all chapter 13 debtors engaged in business.

The canon's persuasive force is further diminished by the reality that section 1325(b)(2)(B) was part of the Bankruptcy Code before the major changes wrought by BAPCPA. While BAPCPA has been maligned by many commentators, Congress does not (nor can it be expected to) write statutes with complete clairvoyance.  By incorporating an IRS rubric that does not permit business expense deductions for above-median-income debtors, the gross business receipts approach fails to provide an accurate measure of those debtors' ability to pay.  This deficiency suggests that the business expense deduction in section 1325(b)(2)(B) may be a vestige left in the statute by oversight and not by deliberate choice.  In fact, the legislative history of the 2006 amendment to section 1325 shows a congressional recognition that the statute suffers from defects beyond the charitable contribution problem that was being addressed at that point. See 152 Cong. Rec. H8812-01 (statement of Sen. Conyers) (admonishing members to bear "in mind that while we are fixing the law for tithes and other charitable donations, *basic problems in the law remain unchanged*") (emphasis added).   Perhaps the provision for an above-median-income debtor to take business expense deductions under the means test—when the means test does not allow such deductions—is another "basic problem" with the Code post-BAPCPA.  That problem is remedied by an interpretation of CMI consistent with the net income approach that the debtor prefers.

## V.       CONCLUSION

The trustee's objection will be overruled, and the debtor's plan will be confirmed.

A separate order will issue.


Date: August 25, 2023                    /s/ Michael A. Fagone
                                         _____
                                         Michael A. Fagone
                                         United States Bankruptcy Judge
                                         District of Maine